IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Philip A. Brimmer**

Civil Action No. 17-cv-01450-PAB-KLM

VALLEY FRESH PRODUCE, INC., a California corporation, and
JOHN COTTLE, an individual,

      Plaintiffs,

v.

WESTERN SKYWAYS, INC., a Colorado corporation,
ALAN HEAD, an individual,
RYAN DICKERSON, an individual,
THOMAS W. FARIS, an individual, and
DOES 1 through 5, whose true names are unknown,

      Defendants.
_____

**ORDER**
_____

      This matter is before the Court on Plaintiffs' Fed. R. Civ. P. 56 Motion for Partial

Summary Judgment [Docket No. 58] and Defendants' Motion for Partial Summary

Judgment Pursuant to Fed. R. Civ. P. 56 [Docket No. 59].  The Court has subject

matter jurisdiction under 28 U.S.C. §§ 1331, 1332, and 1367.

## I. BACKGROUND[1]

      This case involves a dispute concerning defendants' installation of a

turbonormalized engine system in plaintiffs' aircraft.  At all times relevant to the dispute,

defendant Western Skyways, Inc. ("Western") was a re-manufacturer of aircraft engines

operating under Repair Station Certificate Number WS9R575J issued by the Federal

Aviation Administration ("FAA") pursuant to 49 U.S.C. § 44707(2).  Docket No. 58 at 2,

_____

[1]The following facts are undisputed unless otherwise indicated.

¶ 4; Docket No. 59 at 2-3, ¶ 1. Western owned and operated a website,

www.westernskyways.com, where it advertised itself as a turbonormalization "specialist"

and represented that pilots could "Fly [Western's] 200 Series Cessna above the

weather at faster Speeds with Western Skyways Turbonormalizing Engine System, the

newest addition to [Western's] line of legendary STC'ed aircraft engine products."

Docket No. 59 at 5, ¶¶ 20-21; *see also* Docket No. 58 at 3, ¶¶ 7-9.[2]

On or about September 8, 2015, plaintiff John Cottle contacted Western about

the possibility of the company completing a turbonormalization conversion on his 1980

Cessna T210N model aircraft ("the aircraft"). Docket No. 59 at 3, ¶ 5-6.[3] A few months

earlier, the Federal Aviation Administration ("FAA") had issued two supplemental type

certificates ("STCs") jointly in the name of Western and another entity, DERS Group

SVC, LLC ("DERS"). Docket No. 58 at 3, ¶ 10; Docket No. 59 at 4, ¶ 13. The STCs

governed the turbonormalization of certain Cessna aircraft, including the Cessna

T210N. Docket No. 58 at 3, ¶ 10; Docket No. 59 at 4, ¶ 13.

On February 18, 2016, Western employee Eric Barker sent plaintiffs a formal

---

[2]The parties disagree over the meaning of "turbonormalization." *See* Docket No. 58 at 3, ¶ 6; Docket No. 67 at 2, ¶ 6. Plaintiffs define "turbonormalization" as a "service that facilitates an increased rate of climb and turbine speed in certain Cessna aircraft, including a 1980 Cessna T210N." Docket No. 58 at 3, ¶ 6. Defendants assert that turbonormalization involves the "modification of a turbo system on a piston (not turbine) engine that allows the aircraft to achieve sea-level power at higher altitudes" and "better climb and cruise performance." Docket No. 67 at 2-3, ¶ 6.

[3]An STC is the mechanism by which the FAA approves modifications to an aircraft's original design. Docket No. 59 at 4, ¶ 12. The STC approves both the modification and the way in which that modification affects the original design. *Id.*; *see also Supplemental Type Certificates*, Federal Aviation Administration, https://www. faa.gov/aircraft/air_cert/design_approvals/stc/ (last modified Aug. 12, 2015).

quotation offering to complete the conversion with a turbonormalization system, a

Western "Gold Seal" remanufactured engine, and a new propeller for $77,484, plus

$5,000-$7,000 in incidental costs. Docket No. 59 at 3, ¶¶ 7-8. Plaintiffs accepted the

proposal and paid Western $85,573.04 to complete the turbonormalization conversion.

*Id.* at 4, ¶ 11; Docket No. 58 at 4, ¶ 15. On or about April 18, 2016, Mr. Cottle delivered

N111VF to Western's facility in Montrose, Colorado. Docket No. 58 at 4, ¶ 16; Docket

No. 59 at 5, ¶ 15. Western did not perform the turbonormalization conversion pursuant

to its repair station authority under 14 C.F.R. Part 145. Docket No. 67 at 9, ¶ 3; *see*

*also* 14 C.F.R. § 145.1 ("This part . . . contains the rules a certified repair station must

follow related to its performance of maintenance, preventive maintenance, or alterations

of an aircraft, airframe, aircraft engine, propeller, appliance, or component part to which

part 43 applies.")[4] Instead, Western had its FAA-certified mechanics perform and sign

off on the work required by the applicable STCs. Docket No. 58 at 4, ¶ 13; Docket No.

59 at 3, ¶ 2-4; Docket No. 67 at 3-4, ¶ 13; Docket No. 69 at 5, ¶ 24; Docket No. 74 at 4,

¶ 24.[5]

---

[4]Plaintiffs dispute this fact on the ground that it constitutes "argument based on the Barker Affidavit, which is not properly before this Court." Docket No. 70 at 6, ¶ 3. However, defendants' assertion that Western performed the turbonormalization conversion pursuant to its Part 145 authority is a statement of fact, not argument. And, as explained in more detail below, the Barker affidavit is properly before the Court. Plaintiffs have therefore failed to demonstrate a genuine issue of fact regarding Western's use of its Part 145 authority.

[5]At all times relevant to this dispute, defendants Alan Head, Ryan Dickerson, and Thomas Faris were FAA-certified mechanics. *See* Docket No. 58 at 2, ¶¶ 1-3; Docket No. 59 at 3, ¶¶ 2-4. Mr. Dickerson and Mr. Faris were employees of Western, while Mr. Head served as Western's president. *See* Docket No. 58 at 2, ¶¶ 1-3; Docket No. 59 at 3, ¶¶ 2-4.

Western returned N111VF to plaintiffs on August 13, 2016. Docket No. 58 at 4, ¶ 17; Docket No. 59 at 5, ¶ 19. On the day of the return, plaintiffs had N111VF inspected by Federico Helicopters, Inc., an FAA-certified repair station, which determined that N111VF had not been turbornormalized in accordance with the controlling STCs and was therefore unairworthy. Docket No. 58 at 4, ¶ 18; Docket No. 59 at 5, ¶ 19.

Plaintiffs filed this lawsuit on June 14, 2017. Docket No. 1. The complaint asserts claims for: (1) violation of the Colorado Consumer Protection Act ("CCPA"), Colo. Rev. Stat. § 6-1-101 *et seq.*; (2) breach of implied warranty under Colo. Rev. Stat. § 4-2-314; (3) breach of express warranty under Colo. Rev. Stat. § 4-2-313; (4) breach of contract; (5) unjust enrichment; (6) negligence; (7) fraudulent concealment; and (8) false advertising in violation of the Lanham Act, 15 U.S.C. § 1125(a). Docket No. 1 at 9-16. The first through fifth causes of action are asserted against Western only. *See id.* at 9-13. The sixth and seventh causes of action are asserted against all four named defendants – Western, Mr. Head, Mr. Dickerson, and Mr. Faris. *See id.* at 14-15. The eighth cause of action is asserted against Western and Mr. Head. *See id.* at 16. On January 11, 2019, the parties filed cross-motions for partial summary judgment. *See* Docket Nos. 58, 59.[6]

---

[6]Before considering the parties' cross-motions for summary judgment, the Court *sua sponte* addresses plaintiffs' claims against the Doe defendants. Neither the summary judgment briefing nor the final pretrial order contains any reference to the Doe defendants, and there is no evidence that they have ever been identified or served in this case. Given that the deadline for joinder of parties and amendment of pleadings was February 7, 2018, Docket No. 28 at 9, plaintiffs did not timely seek leave to identify the Doe defendants and are no longer in a position to do so. Plaintiffs' claims against Does 1-5 will therefore be dismissed without prejudice. *See Mathison v. Wilson*, No.

## II. LEGAL STANDARD

Summary judgment is warranted under Federal Rule of Civil Procedure 56 when the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248-50 (1986). A disputed fact is "material" if under the relevant substantive law it is essential to proper disposition of the claim. *Wright v. Abbott Labs., Inc*., 259 F.3d 1226, 1231-32 (10th Cir. 2001). Only disputes over material facts can create a genuine issue for trial and preclude summary judgment. *Faustin v. City & Cty. of Denver*, 423 F.3d 1192, 1198 (10th Cir. 2005). An issue is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party. *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997).

Where "the moving party does not bear the ultimate burden of persuasion at trial, it may satisfy its burden at the summary judgment stage by identifying a lack of evidence for the nonmovant on an essential element of the nonmovant's claim." *Bausman v. Interstate Brands Corp.*, 252 F.3d 1111, 1115 (10th Cir. 2001) (internal quotation marks omitted) (quoting *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998)). "Once the moving party meets this burden, the burden shifts to the nonmoving party to demonstrate a genuine issue for trial on a material matter." *Concrete Works of Colo., Inc. v. City & Cty. of Denver*, 36 F.3d 1513, 1518 (10th Cir.

14-cv-03345-RM-STV, 2017 WL 4221396, at *9 (D. Colo. Feb. 28, 2017) (recommending dismissal of Doe defendants who were not identified, served, or included in the final pretrial order), *report and recommendation adopted*, 2017 WL 4227570 (D. Colo. May 10, 2017).

1994).  The nonmoving party may not rest solely on the allegations in the pleadings, but instead must designate "specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (internal quotation marks omitted). "To avoid summary judgment, the nonmovant must establish, at a minimum, an inference of the presence of each element essential to the case."  *Bausman*, 252 F.3d at 1115.  When reviewing a motion for summary judgment, a court must view the evidence in the light most favorable to the non-moving party.  *Id.*  However, where, as here, there are cross motions for summary judgment, the reasonable inferences drawn from affidavits, attached exhibits, and depositions are rendered in the light most favorable to the non-prevailing party.  *Jacklovich v. Simmons*, 392 F.3d 420, 425 (10th Cir. 2004).  Furthermore, "[w]hen the parties file cross motions for summary judgment, we are entitled to assume that no evidence needs to be considered other than that filed by the parties, but summary judgment is nevertheless inappropriate if disputes remain as to material facts."  *Atlantic Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1148 (10th Cir. 2000) (internal quotation marks omitted).

## III.  EVIDENTIARY ISSUES

The Court begins by addressing two evidentiary issues raised in the parties' summary judgment motions.

The first issue concerns the admissibility of Eric Barker's affidavit, Docket No. 67-1, which was submitted by defendants in opposition to plaintiffs' motion for summary judgment.  Plaintiffs request that the Court exclude the affidavit and its exhibits under *Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965 (10th Cir. 2001), because "Mr.

Barker was deposed and subject to cross-examination" and his "affidavit does not resolve any lack of clarity in the record." Docket No. 70 at 1-2.[7] In *Ralston*, the court held that the district court did not abuse its discretion in excluding an affidavit that "directly contradicted certain positions previously taken by [the affiant] and which were detrimental to [the plaintiff's] sole remaining cause of action" because the circumstances supported a conclusion that the affidavit sought to create a "sham fact issue." 275 F.3d at 973. In reaching that holding, the court identified three factors relevant to "whether a contradicting affidavit seeks to create a sham fact issue": (1) whether "the affiant was cross-examined during his earlier testimony"; (2) whether "the affiant had access to the pertinent evidence at the time of his earlier testimony or whether the affidavit was based on newly discovered evidence"; and (3) whether "the earlier testimony reflects confusion which the affidavit attempts to explain." *Id.* at 973. Plaintiffs have not shown that these factors weigh in favor of excluding Mr. Barker's testimony. Even assuming Mr. Barker had access to the same exhibits and was subject to cross-examination during his deposition, plaintiffs have submitted only two short excerpts from Mr. Barker's deposition, neither of which appears to contradict Mr. Barker's affidavit. *See* Docket Nos. 58-8, 72-3.[8] Because the Court is unable to conclude, based on the record before it, that Mr. Barker's affidavit was intended to

---

[7]In addition to raising this objection in their reply brief, plaintiffs filed a document entitled "Evidentiary Objections to the Affidavit and Exhibit of Eric Barker" on March 7, 2019. *See* Docket No. 71. The Court struck the filing on the ground that it reflected an attempt to circumvent the page limits applicable to plaintiffs' reply brief. Docket No. 76.

[8]Plaintiffs also do not identify any conflict between Mr. Barker's deposition testimony and his affidavit.

contradict his earlier testimony, there is no basis for excluding the affidavit under *Ralston*. *See Knitter v. Corvias Military Living, LLC*, 758 F.3d 1214, 1218 n.3 (10th Cir. 2014) (holding that witness's affidavit did not "fit[] the sham affidavit paradigm" because it did not "contain any allegations that would directly contradict [the witness's] earlier deposition testimony" (internal quotation marks omitted)); *see also Law Co., Inc. v. Mohawk Constr. & Supply Co., Inc.*, 577 F.3d 1164, 1169 (10th Cir. 2009) (holding that the district court abused its discretion by excluding affidavits without first identifying how they conflicted with prior deposition testimony).

The second evidentiary issue concerns plaintiffs' reliance on an uncertified transcript of Philip Baker's deposition. *See* Docket Nos. 58-15, 69-4. The front page of the transcript contains a disclaimer stating that it is an "unedited" and "uncertified rough draft transcript" that "cannot be used or cited in any court proceedings." Docket No. 58-15 at 2; Docket No. 69-4 at 2. Given this clear language and plaintiffs' failure to provide any explanation for submitting an uncertified transcript of Mr. Baker's deposition, the Court will not consider the transcript for purposes of resolving the parties' summary judgment motions. *See* Fed. R. Civ. P. 30(f)(1) (requiring that deposition transcripts include a certification "that the witness was duly sworn and that the deposition accurately records the witness's testimony"); *compare Christmon v. B&B Airparts, Inc.*, 735 F. App'x 510, 513 (10th Cir. 2018) (unpublished) (holding that Fed. R. Civ. P. 30(f)(1) did not bar the court's consideration of certain deposition testimony on summary judgment because the defendant had filed the requisite certification with the

court).[9]

## IV. DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Defendants move for summary judgment on plaintiffs' Lanham Act, CCPA, fraudulent concealment, unjust enrichment, and negligence claims. *See generally* Docket No. 59.

### A. Lanham Act Claim

Plaintiffs assert a claim under the Lanham Act, 15 U.S.C. § 1125(a), based on allegedly false or misleading statements of fact made by Western and/or Mr. Head with respect to "their ability to turbonormalize the engines of 210 Series Cessna aircraft." Docket No. 1 at 17, ¶¶ 85. Defendants assert that this claim fails as a matter of law because a consumer is not entitled to bring a claim for false advertising under the Lanham Act. *See* Docket No. 59 at 12. Plaintiffs make no argument in opposition to defendants' request for summary judgment on this claim. *See generally* Docket No. 69; *see also* Docket No. 74 at 2 (noting plaintiffs' failure to address defendants' argument regarding the Lanham Act claim).

The Court agrees that plaintiffs' claim is foreclosed by *Lexmark International, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014), in which the Supreme Court held that a plaintiff asserting a false advertising claim under the Lanham Act "must allege an injury to a commercial interest in reputation or sales" and thus "[a] consumer who is hoodwinked into purchasing a disappointing product . . . cannot invoke the

---

[9]Even if the Court were to consider the uncertified transcript, nothing in Mr. Baker's deposition testimony alters the Court's resolution of the parties' summary judgment motions.

protection of" the statute.  *Id.* at 131-32; *see also POM Wonderful LLC v. Coca-Cola Co.*, 573 U.S. 102, 107 (2014) ("Though in the end consumers also benefit from the [Lanham] Act's proper enforcement, the cause of action [for unfair competition through misleading advertising] is for competitors, not consumers.").  Because plaintiffs assert a Lanham Act claim based on injuries allegedly sustained by them as consumers of defendants' turbonormalizing services, *see* Docket No. 1 at 4, 6, 8, 17, ¶¶ 12-15, 24, 33, 85-87; Docket No. 77 at 2-3, defendants are entitled to summary judgment on this claim.

### B.  Colorado Consumer Protection Act Claim

Plaintiffs allege that Western violated the CCPA, Colo. Rev. Stat. § 6-1-101 *et seq.*, by making allegedly false, unfair, and deceptive statements regarding its status as a "turbonormalization specialist."  Docket No. 1 at 9-10, ¶¶ 41-48; Docket No. 77 at 2-3. Defendants move for summary judgment on this claim, arguing that (1) the challenged statements constitute non-actionable "puffery," Docket No. 59 at 7; and (2) the challenged statements were not deceptive.  *Id.* at 10-11.

To succeed on a claim under the CCPA, plaintiffs must show that: (1) Western engaged in an unfair or deceptive trade practice; (2) the challenged practice occurred in the course of Western's business, vocation, or occupation; (3) the challenged practice significantly impacts the public as actual or potential consumers of Western's goods, services, or property; (4) plaintiffs suffered injury in fact to a legally protected interest; and (5) the challenged practice caused plaintiffs' injury.  *Alpine Bank v. Hubbell*, 555 F.3d 1097, 1112 (10th Cir. 2009) (citing *Hall v. Walter*, 969 P.2d 224, 235 (Colo. 1998)).

10

As relevant here, the CCPA provides that a

> person engages in a deceptive trade practice when, in the course of the
> person's business, vocation, or occupation, the person . . .
>
> > (e) Either knowingly or recklessly makes a false representation as
> > to the characteristics, ingredients, uses, benefits, alterations, or
> > quantities of goods, food, services, or property or a false
> > representation as to the sponsorship, approval, status, affiliation, or
> > connection of a person therewith; . . .
> >
> > (g) Represents that goods, food, services, or property are of a
> > particular standard, quality, or grade, or that goods are of a
> > particular style or model, if he knows or should know that they are
> > of another; . . .
> >
> > (u) Fails to disclose material information concerning goods,
> > services, or property which information was known at the time of an
> > advertisement or sale if such failure to disclose such information
> > was intended to induce the consumer to enter into a transaction[.]

Colo. Rev. Stat. § 6-1-105(1); *see also* Docket No. 58 at 15 (citing Colo. Rev. Stat.

§§ 6-1-105(1)(e), (g), and (u) as bases for CCPA claim).[10]  These provisions proscribe

both the making of false representations and the failure to disclose material information

concerning goods, services, or property.

### 1.  False Representations

At all times relevant to this lawsuit, Western advertised itself on its website as

---

[10]In their motion for partial summary judgment, plaintiffs suggest that their CCPA
claims is also based on Colo. Rev. Stat. § 6-1-105(1)(h).  *See* Docket No. 58 at 15.
However, that provision only applies when a defendant "[d]isparages the goods,
services, property, or business of another by false or misleading representation of fact."
Colo. Rev. Stat. § 6-1-105(1)(h).  Because there are no allegations that defendants
"disparaged" anything belonging to plaintiffs, *compare Wilson v. AdvisorLaw LLC*, No.
17-cv-01525-MSK, 2018 WL 858738, at *4 (D. Colo. Feb. 14, 2018) (allegations that
the defendants had posted a review of the plaintiff's services that contained false
statements of fact were sufficient to state a claim for disparagement under the CCPA),
§ 6-1-105(1)(h) does not apply.

"Western Skyways – The Turbonormalization Engine Systems Specialist" and represented that pilots could "Fly [our] 200 Series Cessna above the weather at faster Speeds with Western Skyways Turbonormalizing Engine System, the newest addition to our line of legendary STC'ed aircraft engine products."  Docket No. 59 at 5, ¶ 21. Plaintiffs allege that these statements were "false, unfair, and deceptive" under the CCPA because Western "is not a turbonormalization specialist, and does not hold the STC on the T210 aircraft engine."  Docket No. 1 at 10, ¶ 46.  Western argues it is entitled to summary judgment on this claim because there is no dispute that Western is a turbonormalization specialist and holds the relevant STCs.  Docket No. 59 at 10.

The Court agrees that plaintiffs have failed to establish the first element of their false representation claim under the CCPA.  To show that Western engaged in a deceptive trade practice, plaintiffs must offer proof of a knowing "misrepresentation or . . . false representation [that] had the capacity or tendency to deceive, even if it did not."  *Rhino Linings USA, Inc. v. Rocky Mountain Rhino Lining, Inc.*, 62 P.3d 142, 148 (Colo. 2003); *see also Crowe v. Tull*, 126 P.3d 196, 204 (Colo. 2006) ("A CCPA claim will only lie if the plaintiff can show the defendant knowingly engaged in a deceptive trade practice.").  A "misrepresentation" is defined as "a false or misleading statement that induces the recipient to act or refrain from acting."  *Rhino Linings USA, Inc.*, 62 P.3d at 147.

Plaintiffs assert that the statements on Western's website were false or misleading in two respects: (1) Western was not actually a turbonormalization "specialist" because it was "incapable of performing the turbonormalizing as advertised"; and (2) Western did not have the ability to independently implement the

relevant STCs.  Docket No. 69 at 9-10.

In support of their first contention, plaintiffs cite evidence that Western's Repair Station Certificate did not allow the company to perform certain aspects of the turbonormalization process, such as fabricating engine components for the aircraft. *See* Docket No. 69 at 8 (citing deposition testimony of Ryan Dickerson and Allen Head), 9 (referring to analysis on page 8 in support of CCPA claim); Docket No. 69-1 at 31-32, 34:20-35:4 (Head deposition) (testifying that Western's repair station certificate did not allow it to fabricate engine components); Docket No. 69-2 at 9-11, 65:15-18, 69:24-70:5 (Dickerson deposition) (same).  However, the Repair Station Certificate was only one source of authority that Western relied upon to perform repair work on aircraft.  As explained by Western's general manager, Eric Barker, the "FAA allows entities such as Western to perform repairs and modifications on aircraft through licensed mechanics under its employment outside of the authority of the Repair Station Certificate."  Docket No. 67-1 at 3, ¶ 9; *see also* Docket No. 74 at 6.  Mr. Barker stated that the work on plaintiffs' N111VF was not performed under Western's Repair Station Certificate, but through Western employees Al Head, Ryan Dickerson, and Tom Faris, who at all times relevant to this lawsuit held mechanic certifications from the FAA.  Docket No. 67-1 at 3, ¶ 9; Docket No. 59 at 3, ¶¶ 2-4.

Plaintiffs have not cited any evidence or authority showing that Western was not permitted to rely on the individual mechanic certifications of its employees to complete the turbonormalization process on plaintiffs' aircraft.  Instead, in their reply in support of partial summary judgment, plaintiffs argue that Western should be held liable because it failed to take "steps to link an authorized serial number to the work performed on

N111VF" and "did not install a propeller on N111VF that was approved" under the relevant STC. Docket No. 70 at 9-10. This argument blurs the distinction between a breach of contract claim, "which arises when one contracting party breaks a promise," and a CCPA claim, which "arises when a party knowingly makes a misrepresentation or . . . false representation that has the capacity to deceive." *Rhino Linings USA, Inc.*, 62 P.3d at 148. To succeed on the latter, plaintiffs were obligated to show that Western knew it was incapable of turbonormalizing plaintiffs' aircraft at the time it made the challenged statements regarding its status as a turbonormalization "specialist." *See Crowe*, 126 P.3d at 204; *see also Clancy Sys. Int'l, Inc. v. Image Sensing Sys., Inc.*, No. 16-cv-01848-CMA-KMT, 2017 WL 3086624, at *4 (D. Colo. Jan. 30, 2017) (recommending dismissal of a CCPA claim because the plaintiff had not alleged any facts indicating that the defendant knew or had reason to know that it could not fulfill its promises), *report and recommendation adopted*, 2017 WL 3084915 (D. Colo. Feb. 17, 2017).[11] Given their failure to rebut Western's evidence that it was entitled to rely on its employees' individual mechanic certifications, plaintiffs have not made this showing.

For similar reasons, plaintiffs' claim regarding Western's inability to implement the relevant STCs also fails. Plaintiffs contend that there is a genuine issue of fact as to whether Western was capable of supplying the serial number necessary to render plaintiffs' turbonormalized aircraft compliant with the applicable STCs. *See* Docket No.

---

[11]Plaintiffs' only theory as to why it was false or misleading for Western to advertise itself as a turbonormalization specialist was that Western was incapable of performing the turbonormalization as advertised. *See* Docket No. 69 at 8-10; *see also* Docket No. 58 at 16. Plaintiffs do not argue that Western lacked experience completing turbonormalization conversions.

69 at 10.[12]  The parties do not dispute that both Western and DERS Group held the STCs for the turbonormalization of the Cessna T210.  Docket No. 59 at 4, ¶ 13.  Those STCs required Western to contact DERS Group "to obtain a turbo-normalized engine serial number," which was to be affixed to any turbonormalized aircraft before its release to service.  *See* Docket No. 69-5 at 3.  The evidence shows that, although Western had followed this procedure in the past, Docket No. 69-1 at 39-45, 67:18-73:24, it did not seek a serial number from DERS Group with respect to plaintiffs' aircraft.  *See* Docket No. 69-1 at 37, 56:20-22.  Instead, Mr. Head and Mr. Dickerson testified that Western received authorization from the FAA to deviate from the serial number requirement.  Docket No. 67-4 at 2, ¶ 5; Docket No. 69-2 at 29:1-20; Docket No. 82 at 75-78, 81, 75:17-78:4, 81:10-14.[13]

Plaintiffs cite Western's failure to obtain a serial number from DERS Group as evidence that Western "could not, as required by FAA regulations and the STCs, provide Plaintiffs a serial number for N111VF."  Docket No. 69 at 10.  But this

_____

[12]Plaintiffs alleged in the complaint that the statements on Western's website were false and deceptive because Western did not hold the STCs on plaintiffs' aircraft – the Cessna T210.  Docket No. 1 at 10, ¶ 46.  In their response to defendants' summary judgment motion, however, plaintiffs do not dispute that the FAA issued an STC for the turbonormalization conversion of the Cessna T210 to both DERS Group and Western.  Docket No. 59 at 4, ¶ 13.  Instead, plaintiffs argue that Western lacked the authority to independently implement the STC.  The Court need not decide whether plaintiffs were permitted to alter their claim in this manner because their argument on summary judgment fails on other grounds.

[13]Mr. Head later clarified in his deposition that the FAA did not "approve" the deviation, but instructed Western "how to do it."  Docket No. 82 at 81, 81:15-22; *see also* Docket No. 58-14 at 2-3, ¶¶ 5-6 (affidavit by Mark Grace indicating that he was not responsible for approving repair station deviations).  The Court finds this distinction immaterial.  The pertinent issue is whether Western knew it would be unable to satisfy the serial number requirement at the time it advertised its turbonormalization services.

contention is belied by the evidence that it was possible for Western to deviate from the serial number requirement and remain compliant with the applicable STCs.  Even if Western's actual deviation was improper, plaintiffs have failed to show that Western knew it was incapable of obtaining a turbonormalized engine serial number at the time it made the challenged representations on its website.[14]  As a result, plaintiffs have not demonstrated a knowing "misrepresentation or . . . false representation" with respect to Western's ability to perform turbonormalization conversions in compliance with the applicable STCs.  *Rhino Linings USA, Inc.*, 62 P.3d at 148.  Western is therefore entitled to summary judgment on plaintiffs' CCPA claim to the extent it is based on the deceptive trade practices set forth in Colo. Rev. Stat. §§ 6-1-105(1)(e) and (g).[15]

### 2.  *Material Omissions*

Plaintiffs also assert a CCPA claim based on Western's alleged failure to disclose material information regarding its ability to perform turbonormalization conversions in accordance with FAA requirements.  *See* Docket No. 58 at 15-16 (citing Colo. Rev. Stat. § 6-1-105(1)(u) and arguing that "Western failed to disclose . . . material information that Western could not turbonormalize N111VF").[16]  To prevail on this claim, plaintiffs must show that (1) Western failed to disclose information

_____

[14]The evidence does support a finding that Western knew it was incapable of obtaining a serial number from DERS Group.  *See* Docket No. 84 at 117, 117:12-17.

[15]Given this disposition, the Court need not decide whether Western's advertisements constituted non-actionable "puffery."  *See* Docket No. 59 at 7-9.

[16]Although plaintiffs do not specifically assert this claim in response to defendants' summary judgment motion, *see* Docket No. 69 at 9-10, the Court will consider the argument in order to avoid having to separately resolve this aspect of plaintiffs' motion for partial summary judgment.

concerning its goods or services; (2) Western knew this information at the time of the advertisement or sale of its goods or services; (3) the non-disclosed information was material; and (4) Western failed to disclose the information with the intent to induce plaintiffs to enter into a turbonormalization contract. *See Warner v. Ford Motor Co.*, No. 06-cv-02443-JLK-MEH, 2008 WL 4452338, at *10 (D. Colo. Sept. 30, 2008); *see also* Colo. Rev. Stat. § 6-1-105(1)(u).

As a basis for their failure-to-disclose claim, plaintiffs assert that "Western never informed [them] that Western *itself* was not capable of performing the turbonormalization or that its failure to pay DERS for services rendered precluded it from completing the turbonormalization as advertised." Docket No. 58 at 16; *see also* Docket No. 69 at 11-12. With regard to the latter omission, plaintiffs rely on the same evidence, discussed above, that Western was unable to procure a turbonormalized serial number from DERS Group as required by the STCs. As noted above, the evidence supports a finding that Western had the ability to deviate from the serial number requirement. Docket No. 67-4 at 2, ¶ 5; Docket No. 69-2 at 29:1-20; Docket No. 82 at 75-78, 81, 75:17-78:4, 81:10-14. Even if that deviation was faulty, plaintiffs have not offered any evidence showing that Western knew it was incapable of obtaining a turbonormalized engine serial number at the time it advertised its services. Plaintiffs have therefore failed to demonstrate a genuine issue of fact as to whether Western knew of the non-disclosed information – namely, its inability to obtain a turbonormalized engine serial number – at the time of the alleged omission. *See Warner*, 2008 WL 4452338, at *10.

Regarding the other omission alleged by plaintiffs – Western's failure to disclose

that it was capable of performing the turbonormalization only through its licensed mechanics, and not under its repair station certificate – plaintiffs have not demonstrated a genuine issue of fact as to materiality.  *See* Docket No. 74 at 6 (arguing that plaintiffs have offered "no support, legal, factual or otherwise" for the position that "Western's employees performing the work is somehow different than Western itself performing the work").  While plaintiffs assert, with respect to their fraudulent concealment claim, that the "FAA investigation into the problems with Western's fraudulent concealment . . . underscore[s] the materiality of" the non-disclosure, Docket No. 58 at 12-13, plaintiffs have not provided any evidence that the FAA's inability to take direct enforcement action against Western, *see* Docket No. 58-18 at 4, 6-8, as opposed to its mechanics, would have been material to either plaintiffs or consumers generally in deciding whether to purchase the company's turbonormalization services.  *See Warner*, 2008 WL 4452338, at *8 (declining to decide whether materiality is based on the preferences of the individual plaintiff or consumers more generally, but finding the requirement met under either standard).  Because plaintiffs have failed to establish materiality, Western is entitled to summary judgment on their failure-to-disclose claim under the CCPA.

### C.  Fraudulent Concealment Claim

To succeed on a claim for fraudulent concealment under Colorado law,[17] plaintiffs must prove:

---

[17]The parties appear to agree that Colorado law governs plaintiffs' state common law claims.  *See* Docket No. 58 at 11; Docket No. 59 at 14.  The Court will operate under the same premise.  *Cf. Grynberg v. Total S.A.*, 538 F.3d 1336, 1346 (10th Cir. 2008) ("Because the parties' arguments assume that Colorado law applies, we will proceed under the same assumption.").

> (1) the concealment of a material existing fact that in equity and good conscience [defendants] should have disclosed; (2) knowledge on [defendants'] part that such a fact was being concealed; (3) ignorance of that fact on [plaintiffs'] part; (4) the intention that the concealment be acted upon; and (5) action on the concealment resulting in damages.

*Rocky Mountain Exploration, Inc. v. Davis Graham & Stubbs LLP*, 420 P.3d 223, 234 (Colo. 2018). Plaintiffs base their fraudulent concealment claim on the same alleged omissions as their CCPA failure-to-disclose claim. *Compare* Docket No. 69 at 11-12, *and* Docket No. 58 at 11-13, *with* Docket No. 58 at 16. In addition, the parties assert the same arguments with respect to both claims. *See* Docket No. 69 at 1-12; Docket No. 74 at 7. Thus, for the same reasons discussed as to plaintiffs' material omission claim under the CCPA – namely, plaintiffs' failure to show (1) that defendants knew they were incapable of complying with the STCs' serial number requirement at the time Western advertised its services, and (2) that Western's inability to perform the turbonormalization under its repair station certificate constituted "material" information – the Court will grant summary judgment in favor of defendants on plaintiffs' claim for fraudulent concealment.[18]

### D. Unjust Enrichment Claim

Defendants move for summary judgment on plaintiffs' unjust enrichment claim, arguing that there is an express contract covering the same subject matter. Docket No. 59 at 12-14. Plaintiffs respond that they have not admitted to the existence of a contract and that, even if one exists, it does not preclude plaintiffs' unjust enrichment

---

[18]Because plaintiffs have failed to establish the requisite elements of their fraudulent concealment claim, the Court need not determine whether plaintiffs failed to plead the claim with particularity. *See* Docket No. 74 at 7.

claims against the individual defendants who were not parties to the contract.  Docket
No. 69.

The Court agrees with defendants that plaintiffs' unjust enrichment claim must be
dismissed.  An unjust enrichment claim "requires a showing that (1) at plaintiff's
expense (2) defendant received a benefit (3) under circumstances that would make it
unjust for defendant to retain the benefit without paying."  *Robinson v. Colo. State
Lottery Div.*, 179 P.3d 998, 1007 (Colo. 2008).  Colorado law is well-settled that "a party
cannot recover for unjust enrichment by asserting a quasi-contract when an express
contract covers the same subject matter because the express contract precludes any
implied-in-law contract."  *Interbank Invs., LLC v. Eagle River Water & Sanitation Dist.*,
77 P.3d 814, 816 (Colo. App. 2003).  Here, the parties do not dispute that, by accepting
Western's proposal for the turbonormalization conversion, plaintiffs entered into a
contract with Western for those services.  Docket No. 59 at 4, ¶ 11; *see also* Docket
No. 77 at 8, ¶¶ 19-22 (stipulating to existence of a contract for the turbonormalization
conversion).[19]  In addition, it is clear from the allegations that the turbonormalization
contract covers the same subject matter as plaintiffs' unjust enrichment claim – namely,
defendants' failure to deliver an airworthy aircraft.  *Compare* Docket No. 1 at 13, ¶ 62
(alleging that Western breached the parties' contract by failing to install a
turbonormalization engine that complied with FAA requirements, thereby rendering the
aircraft unairworthy), *with id.* at 13-14, ¶ 67 (asserting it would be unjust for Western to

---

[19]Because the parties stipulated to this fact on summary judgment and in the
final pretrial order, it is irrelevant whether the allegations in the complaint constitute
binding judicial admissions.  *See* Docket No. 69 at 13.

retain the payment for the turbonormalization conversion given the "numerous violations of FAA Regulations committed by Defendant Western"). Western is therefore entitled to summary judgment on this claim. *See Echostar Satellite, L.L.C. v. Splash Media Partners, L.P.*, No. 07–cv-02611-PAB-BNB, 2010 WL 3873282, at *8-9 (D. Colo. Sept. 29, 2010) (dismissing unjust enrichment claim on summary judgment because there was an express contract covering the same subject matter).[20]

### E.  Negligence Claims

Plaintiffs assert a negligence claim based on defendants' failure to deliver an FAA-compliant aircraft following the turbonormalization conversion. Docket No. 1 at 14, ¶¶ 69-70. Defendants argue that this claim is barred by Colorado's economic loss rule, Docket No. 59 at 14, which provides that "a party suffering only economic loss from the breach of an express or implied contractual duty may not assert a tort claim for such a breach absent an independent duty of care under tort law." *Spring Creek Exploration & Prod. Co., LLC v. Hess Bakken Inv., II, LLC*, 887 F.3d 1003, 1020 (10th Cir. 2018) (quoting *Town of Alma v. AZCO Constr., Inc.*, 10 P.3d 1256, 1264 (Colo. 2000)).[21]  In

---

[20]Plaintiffs contend that their contract with Western does not preclude them from bringing unjust enrichment claims against defendants Head, Faris, and Dickerson. *See* Docket No. 69 at 13. While this may be true, plaintiffs never asserted an unjust enrichment claim against the individual defendants. *See* Docket No. 1 at 13 (asserting their unjust enrichment claim "[a]s to Defendant Western").

[21] The Colorado Supreme Court has identified "three main policy reasons" that support the application of the rule "between and among commercial parties . . . :  (1) to maintain a distinction between contract and tort law; (2) to enforce expectancy interests of the parties so that they can reliably allocate risks and costs during their bargaining; and (3) to encourage the parties to build the cost considerations into the contract because they will not be able to recover economic damages in tort."  *BRW, Inc. v. Dufficy & Sons, Inc.*, 99 P.3d 66, 72 (Colo. 2004).

applying the economic loss rule, courts must initially identify "the source of the duties of the parties." *Town of Alma*, 10 P.3d at 1262. "Tort obligations generally arise from duties imposed by law," while "[i]n contrast, contract obligations arise from promises made between parties." *Id.* ("'A breach of a duty which arises under the provisions of a contract between the parties must be redressed under contract, and a tort action will not lie.'" (quoting *Tommy L. Griffin Plumbing & Heating Co. v. Jordan, Jones & Goulding, Inc.*, 463 S.E.2d 85, 88 (S.C. 1995))). The Colorado Supreme Court has made clear that the focus should not be on the nature of the loss, i.e., whether it is economic, but rather on the source of the duty. *Id.* at 1262 n.8 ("[W]e believe that a more accurate designation of what is commonly termed the 'economic loss rule' would be the 'independent duty rule.'"). In determining the source of the duty at issue in a particular case, courts consider three factors: "(1) whether the relief sought in negligence is the same as the contractual relief; (2) whether there is a recognized common law duty of care in negligence; and (3) whether the negligence duty differs in any way from the contractual duty." *BRW, Inc.*, 99 P.3d at 74.

Applying these factors in this case, defendants have not shown that the economic loss rule bars plaintiffs' negligence claim. There appears to be no dispute that the first factor weighs in favor of applying the economic loss rule in this case. Plaintiffs' negligence and breach-of-contract claims seek identical relief, namely, recovery of the $85,573 plaintiffs paid for the turbonormalization conversion, the $100,000 plaintiffs paid for the replacement engine, and economic damages stemming from plaintiffs' lost use of N111VF. *See* Docket No. 1 at 13-14, ¶¶ 64, 73. However,

the remaining factors weigh in plaintiffs' favor.

A breach of a duty is "actionable in tort notwithstanding the economic-loss rule" if two conditions are met: (1) the duty arises "from a source other than the relevant contract"; and (2) the duty is not also "imposed by the contract." *Haynes Trane Serv. Agency, Inc. v. Am. Standard, Inc.*, 573 F.3d 947, 962 (10th Cir. 2009). Regarding the first condition, Colorado law recognizes a "common-law obligation to exercise due care, caution and skill . . . in all undertakings when the rights of others are involved." *Lembke Plumbing & Heating v. Hayutin*, 366 P.2d 673, 675 (Colo. 1961); *see also Scott v. Matlack, Inc.*, 39 P.3d 1160, 1166 (Colo. 2002) ("The defendant owes a duty to act when it is reasonably foreseeable that the failure to act will create an unreasonable risk of harm to another."). The contours of this duty may be defined, in a given context, by legislative enactments and administrative regulations. *See Gerrity Oil & Gas Corp. v. Magness*, 946 P.2d 913, 930 (Colo. 1997) ("Relevant legislative enactments and administrative regulations may, in some cases, establish the standard of care in negligence actions, while in other cases they may serve only as evidence of that standard."); *cf. Scott v. Matlack, Inc.*, 39 P.3d at 1170 (holding that OSHA regulations were admissible evidence of the industry standard of care in a negligence action). Here, plaintiffs contend that FAA regulations imposed a duty of care on defendants independent of the parties' contract. Docket No. 69 at 14; *see also* 49 U.S.C. § 44713(a) ("A person operating, inspecting, repairing, or maintaining [equipment used in air transportation] shall comply with [FAA] requirements, regulations, and orders."). Those regulations set forth various requirements related to the maintenance and

alteration of aircraft. *See, e.g.*, 14 C.F.R. § 43.3(b) ("The holder of a mechanic certificate may perform maintenance, preventive maintenance, and alterations as provided in Part 65 of this chapter."), *id.*, § 43.5 (requirements for approving an aircraft for a return to service), *id.*, § 43.9 (record-keeping requirements), *id.*, § 43.13(a) ("Each person performing maintenance, alteration, or preventive maintenance on an aircraft, engine, propeller, or appliance shall use the methods, techniques, and practices prescribed in the current manufacturer's maintenance manual or Instructions for Continued Airworthiness prepared by its manufacturer, or other methods, techniques, and practices acceptable to the Administrator, except as noted in § 43.16. He shall use the tools, equipment, and test apparatus necessary to assure completion of the work in accordance with accepted industry practices.").

Defendants do not dispute that they were required to comply with FAA regulations in completing the turbonormalization conversion. However, they contend that the express warranty provisions in the parties' contract "obviate[d] any separate duties." Docket No. 74 at 8.

A "general tort duty is independent of contractual duties if the contract contains no duties or the allegedly breached tort duty is beyond the scope of the duties contained within the contract at issue." *S K Peightal Engineers, LTD v. Mid Valley Real Estate Sols. V, LLC*, 342 P.3d 868, 875 (Colo. 2015).[22] By comparison, where the duty

---

[22]In *S K Peightal Engineers, LTD*, the Colorado Supreme Court recognized a second type of "independent duty" that is automatically triggered by a "special relationship" between the parties. *See* 342 P.3d at 875. However, Colorado courts have recognized only a few special relationships giving rise to this type of independent duty, *Miller v. Bank of New York Mellon*, 379 P.3d 342, 348 (Colo. App. 2016), and plaintiffs do not invoke the "special relationship" rule in arguing that defendants had an

of care allegedly owed by a defendant is "memorialized" in the parties' contract, a

plaintiff will be unable to show "any duty independent" of the contract, and the economic

loss rule will bar its tort claim. *BRW, Inc.*, 99 P.3d at 74.

In arguing that the tort duty allegedly owed by defendants was subsumed under

the parties' contract, defendants rely on two warranty provisions, which state, in

relevant part:

> Western Skyways, Inc. warrants the GOLD SEAL aircraft engine to be
> free from defects in material and workmanship under normal use for SIX
> (6) MONTHS from date of installation or beginning ten (10) days after
> shipment, whichever is applicable.

Docket No. 59-1 at 7 ("Gold Seal Aircraft Engine Warranty").

> Western Skyways, Inc. warrants the Turbonormalizing system to be free
> from defects in material and workmanship under normal use for FOUR (4)
> YEARS or 1000 hours "whichever occurs first" from date of installation at
> its Montrose Colorado facility.

*Id.* at 8 ("Turbo System Warranty").[23]   Defendants argue that these provisions

_____

independent obligation to comply with FAA regulations.

[23]In their reply in support of their partial summary judgment motion, plaintiffs
deny that Mr. Cottle was aware of the express warranty provisions because the
warranty documents are unsigned and do "not contain any information showing them to
specifically apply to any aircraft or repair offer." Docket No. 70 at 6, ¶ 7. In response to
defendants' summary judgment motion, however, plaintiffs state that Western's "offer
included all pages of the Defendant Western's Quotation and Warranty," Docket No. 69
at 3, ¶ 9, and admit that they "accepted . . . Western's proposal," thereby entering into a
contract with the company. Docket No. 59 at 4, ¶ 11; Docket No. 69 at 4, ¶ 11.
Moreover, plaintiffs affirmatively allege in their complaint that Western's warranty
regarding "defects in material and workmanship" was "a part of the basis of the bargain
between the parties." Docket No. 1 at 12, ¶ 56. The Tenth Circuit has held that
allegations and admissions in the pleadings are "in the nature of judicial admissions
binding upon the parties, unless withdrawn or amended." *Grynberg v. Bar S Servs.,
Inc.*, 527 F. App'x 736, 739 (10th Cir. 2013) (unpublished). Because plaintiffs have not
withdrawn their allegations regarding Western's express warranty, any attempt to
"disavow [their] earlier judicial admissions about the validity of [that warranty] with

memorialized the tort duty allegedly owed by Western because plaintiffs' negligence claim, which seeks to hold defendants liable for delivering to plaintiffs "an aircraft that did not meet the standards imposed by the FAA for private aircraft," Docket No. 1 at 14, ¶ 70, is "based on a duty relating to the quality of workmanship with respect to the Aircraft." Docket No. 74 at 9.

The issue presented is thus whether a warranty for "defects in material and workmanship" can be reasonably construed as encompassing a duty to comply with federal regulations. Because defendants do not cite any authority addressing the issue, the Court begins its analysis with the plain language of the parties' contract. Under Colorado law, contract terms "must be examined and construed in harmony with [their] plain and generally accepted meaning" unless there is some indication that the parties intended otherwise. *Level 3 Commc'ns, LLC v. Liebert Corp.*, 535 F.3d 1146, 1154 (10th Cir. 2008) (quoting *East Ridge of Fort Collins, LLC v. Larimer & Weld Irrigation Co.*, 109 P.3d 969, 1154 (Colo. 2005)). The plain meaning of "defect" is "an imperfection that impairs worth or utility" or "a lack of something necessary for completeness, adequacy, or perfection." *Defect*, Merriam-Webster Collegiate Dictionary (11th ed. 2007). The term "material" is defined as "the elements, constituents, or substances of which something is composed or can be made." *Material*, Merriam-Webster Collegiate Dictionary (11th ed. 2007). Finally, "workmanship" signifies "[t]he (degree of) skill, art, or craftsmanship with which a task is done or a product made," *Workmanship*, Oxford English Dictionary, *available at*

---

seemingly contrary evidence at summary judgment does not create a disputed issue of fact." *Id.*

oed.com/view/Entry/230247?redirectedFrom= workmanship#eid (last visited Sept. 9, 2019), or "the quality imparted to a thing in the process of making." *Workmanship*, Merriam-Webster Collegiate Dictionary (11th ed. 2007). Applying these definitions, "a 'materials' defect is a failing in the quality of the actual substances used to make a product," and "a 'workmanship' defect is a deficiency in the execution of a product's assembly or construction." *Coba v. Ford Motor Co.*, 932 F.3d 114, 121 (3d Cir. 2019).

The Court concludes that defendants' alleged failure to comply with FAA regulations is neither a materials defect nor a workmanship defect under these definitions. While material and workmanship defects relate to the physical quality or realization of a product, *see Coba*, 932 F.3d at 121, regulatory compliance concerns a product's conformity with a particular legal framework. These issues are not coextensive: a product may be flawless in its physical construction, but still fail to satisfy applicable legal requirements. Thus, construing the contract language according to its plain and generally accepted meaning, defendants have not shown that the duty of care allegedly breached by defendants was "also imposed" by the express warranty provisions. *See Haynes Trane Serv. Agency, Inc.*, 573 F.3d at 962; *see also S K Peightal Engineers, LTD*, 342 P.3d at 875 ("[I]f a defendant's specific alleged duties are not governed by the contract, then those duties are independent of the contract and the economic loss rule cannot bar a tort suit for breach of those independent duties."); *compare AVX Corp. v. Corning Inc.*, 2018 WL 4113333, at *10 (E.D.N.C. Aug. 28, 2018) (holding that "any state law tort claim based upon defendants' independent duty to remediate under state and federal law [was] not 'identifiable and distinct from the

27

primary breach of contract claim'" because the parties' agreement required the

defendants to "effect all remedial measures by law or regulation"); *FDIC v. CoreLogic*

*Valuation Servs., LLC*, 2011 WL 5554324, at \*5 (C.D. Cal. Nov. 14, 2011) (holding that

the plaintiff could not recover in tort for the defendant's failure to comply with common

law duties embodied in federal and state standards and regulations where the parties'

contract "represented and warranted that every appraisal service . . . would conform to

federal and state law, regulatory guidelines, and all applicable industry standards");

*Indemnity Ins. Co. of N. Am. v. Am. Eurocopter LLC*, 2005 WL 1610653, at \*18-19

(M.D.N.C. July 8, 2005) (finding a genuine issue of fact precluding summary judgment

on the plaintiff's breach of contract claims where, in addition to warranting that the

aircraft's gearbox would be "free from defects in material and workmanship," the

defendant issued a certification that the overhauled gearbox was "airworthy" and

warranted that the "overhaul was performed in accordance with current regulations of

the Federal Aviation Administration and manufacturer's recommendations").[24]

Defendants' request for summary judgment as to plaintiffs' negligence claims will

therefore be denied.[25]

---

[24]*Town of Alma* does not support a different conclusion.  There, the Colorado
Supreme Court held that the economic loss doctrine barred the plaintiffs' negligence
claims because the parties' contract "specifically impos[ed] a duty of care concerning
[the defendant's] skill and workmanship in installing the water system."  *Town of Alma*,
10 P.3d at 1265.  Unlike in this case, however, the plaintiffs' negligence claims were
based on physical defects in the work performed by the defendant, not on a violation of
regulatory requirements.  *See id.* at 1258.

[25]In light of this resolution, the Court need not address whether the contract
between plaintiffs and Western would have barred plaintiffs' negligence claims against
the individual defendants.  *See* Docket No. 69 at 14.  The Court also will not consider
whether the parties' contract contains any implied warranties sufficient to trigger

## V. PLAINTIFFS' SUMMARY JUDGMENT MOTION

Plaintiffs request that the Court enter summary judgment in their favor on their claims for breach of contract, unjust enrichment, fraudulent concealment, violation of the CCPA, and violation of the Lanham Act. *See* Docket No. 58 at 9-17. Because the Court has already determined that defendants are entitled to summary judgment on plaintiffs' unjust enrichment, fraudulent concealment, CCPA, and Lanham Act claims, the portions of plaintiffs' motion requesting summary judgment on those claims are denied as moot.

As to plaintiffs' breach of contract claim, plaintiffs assert that they are entitled to summary judgment because (1) the parties entered into a contract for the turbonormalization of plaintiffs' aircraft, (2) Western did not turbonormalize the aircraft in accordance with the applicable STCs, and (3) plaintiffs suffered damage by receiving an aircraft that was not airworthy. Docket No. 58 at 9-10.[26] Defendants respond that there are material facts in dispute regarding defendants' compliance with FAA

_____

application of the economic loss rule, *see Hamon Contractors, Inc. v. Carter & Burgess, Inc.*, 229 P.3d 282, 294 (Colo. App. 2009) (holding that alleged tort duty did not "differ in any way" from duties embodied in implied warranties); *Colorado-Ute Elec. Ass'n, Inc. v. Envirotech Corp.*, 524 F. Supp. 1152, 1158 (D. Colo. 1981) (holding that the defendant breached the implied warranties of merchantability and fitness for a particular purpose where it knew that the plaintiff "sought compliance with Colorado air pollution regulations" but failed to provide a precipitator capable of performing at a level "sufficient to meet mandatory state standards"), given that defendants do not raise this issue in their summary judgment briefing.

[26]A breach of contract claim under Colorado law requires proof of three elements: "(1) the existence of a contract, (2) performance by the plaintiff or some justification for nonperformance, (3) failure to perform the contract by the defendant, and (4) resulting damages to the plaintiff." *W. Distrib. Co. v. Diodosio*, 841 P.2d 1053, 1058 (Colo. 1992) (internal citations omitted).

requirements.  Docket No. 67 at 13-14.  They further contend that the parties'
agreement precludes plaintiffs' breach of contract claims.  *Id.* at 14.

Plaintiffs base their breach of contract claim on three primary contentions: (1)
Western did not comply with the STCs' serial number requirement, Docket No. 58 at 5-
6, ¶¶ 21-25, 28, 9; (2) Western installed a propeller that was not approved for use on
plaintiffs' aircraft, *id.* at 6, ¶ 27, 9; and (3) Western improperly relied on its employees'
individual mechanic certifications to perform the turbonormalization conversion.  *Id.* at
4, ¶ 13, 9.[27]

Regarding plaintiffs' first argument, the STCs governing the turbonormalization
conversion of plaintiffs' aircraft required Western to obtain a turbonormalized engine
serial number from DERS Group and to permanently affix that serial number to the
turbonormalized aircraft prior to its release to service.  *See* Docket No. 58-12 at 3.[28]
While defendants admit that Western did not follow this procedure with respect to
plaintiffs' aircraft, Docket No. 58 at 5, ¶ 21, they contend that Western properly deviated
from the requirement pursuant to guidance from the FAA.  *See* Docket No. 67 at 13.
Specifically, Mr. Dickerson testified that he spoke with Mark Grace from the FAA's

---

[27]In their response to plaintiffs' motion for summary judgment, defendants
suggest that plaintiffs have "attempt[ed] to support their [breach of contract] claim
based on typographical errors in the return to service documents."  *See* Docket No. 67
at 13.  But aside from discussing the typographical errors in their statement of
undisputed material facts, *see* Docket No. 58 at 7, ¶ 33, plaintiffs make no argument
that the existence of those errors constituted a breach of the parties' turbonormalization
agreement.  *See generally* Docket No. 58 at 9-10; Docket No. 70 at 8-9.  As a
consequence, plaintiffs have not demonstrated that they are entitled to summary
judgment on that basis.

[28]It is undisputed that an aircraft may not be flown with an incorrect serial
number.  Docket No. 58 at 5, ¶ 23.

Chicago Aircraft Certification Office ("ACO") in January 2016, and that Mr. Grace

indicated Western could deviate from the serial number requirement if it found "wiggle

room" in the STC instructions. Docket No. 58-6 at 28-30, 33-34, 115:24-116:20,

124:19-25, 127:17-128:19; *see also* Docket No. 67-4 at 2, ¶ 5 (stating that Mr.

Dickerson "requested and received approval from the FAA to make a minor deviation to

the STC installation procedures by installing a supplemental data plate with a serial

number for the STC installation").[29] This testimony is corroborated by Mr. Grace's

affidavit, in which he states that, "[s]ometime in the late winter, or early spring, of 2016,

[he] conducted a telephone discussion with Ryan Dickerson . . . on the topic of Western

Skyway's request to obtain FAA's approval to deviate from the installation instructions

of Supplemental Type Certificate (STC) SE03415CH and SE03416CH." Docket No.

58-14 at 2, ¶ 3. Although there is some ambiguity in the record as to whether

Western's ultimate deviation from the serial number requirement was proper, *see*

Docket No. 58-14 at 7 (advising Mr. Dickerson that any deviation from the serial number

requirement "must address basic FAA record keeping and identification requirements

. . . and be in accordance with the FAA approved Western Skyways quality manual");

Docket No. 67 at 6, ¶ 25 (stating that Western's quality manual did not apply to

Western's work on plaintiffs' aircraft because the work was not performed pursuant to

---

[29]Plaintiffs suggest that Mr. Dickerson could not have asked for the FAA's approval to deviate from the serial number requirement with respect to plaintiffs' aircraft because Mr. Dickerson contacted Mr. Grace four months before plaintiffs delivered the aircraft to Western. Docket No. 70 at 3, ¶ 25. However, Mr. Dickerson explained that he requested approval to deviate from the STC generally and not with regard to a specific aircraft. *See* Docket No. 58-6 at 33, 127:17-25. Plaintiffs do not argue that this type of general approval is inadequate.

Western's Repair Station Authority), the evidence, viewed in a light most favorable to

defendants, is sufficient to create a genuine dispute on this issue.[30]

The Court also finds a genuine issue of fact as to whether Western failed to

comply with the STCs by installing a propeller that was not approved for use on

plaintiffs' aircraft.  Mr. Dickerson testified that, although the specific propeller installed

on plaintiffs' aircraft was not listed among the "approved" models, it was a variant of an

approved model that merely added "de-ice boots."  Docket No. 58-6 at 46-47, 163:22-

164:24; *see also* Docket No. 58-7 at 50, 102:1-10.  Mr. Dickerson explained that

installation of this propeller constituted a minor deviation from the applicable STCs.

Docket No. 58-6 at 47, 164:4-13.  Pursuant to FAA regulations, "[m]inor changes in a

type design may be approved under a method acceptable to the FAA before submitting

to the FAA any substantiating or descriptive data."  14 C.F.R. § 21.95; *see also* Docket

No. 67-5 at 12-13, 53:3-17 (acknowledging that there are ways to deviate from the

"STC package" if the change is considered a "minor alteration").  While plaintiffs double

down on their claim that the propeller installed by Western was not approved for use on

their aircraft, plaintiffs do not dispute Mr. Dickerson's assertion that this constituted a

minor deviation from the applicable STCs.  *See* Docket No. 70 at 3-4, ¶ 27, 8.  Nor do

_____

[30]Plaintiffs appear to contend that Western did not comply with the requirements
for a deviation because it did not obtain a serial number from DERS Group before
releasing plaintiffs' aircraft to service.  *See* Docket No. 70 at 3, ¶ 24 (citing Undisputed
Material Facts ¶¶ 12, 20, 21 for proposition that Western did not satisfy the
requirements for a deviation).  But avoiding that requirement was the very purpose of
the deviation, and the only requirement Mr. Grace identified with respect to the
deviation process was that it had to "address basic FAA record keeping and
identification requirements . . . and be in accordance with the FAA approved Western
Skyways quality manual."  Docket No. 58-14 at 7.

they argue that defendants failed to comply with FAA regulations regarding minor changes in type design.

Finally, plaintiffs are not entitled to summary judgment on the claim that Western breached the turbonormalization agreement by having its "mechanics use their individual certifications to sign off on turbonormalization tasks." Docket No. 58 at 9. Defendants have presented evidence that there was nothing improper about Western using its employees to perform and approve modifications on plaintiffs' aircraft under their individual mechanic certifications. *See* Docket No. 67-1 at 3, ¶ 9 (stating that the "FAA allows entities such as Western to perform repairs and modifications on aircraft through licensed mechanics under its employment outside of the authority of the Repair Station Certificate"). This evidence creates a genuine issue of material fact precluding summary judgment in plaintiffs' favor on their breach of contract claim.[31]

In opposing plaintiffs' summary judgment motion, defendants also argue that plaintiffs' breach of contract claim is barred by the exclusive remedy and limitation-of-liability provisions in the turbonormalization agreement. *See* Docket No. 67 at 14. The exclusive remedy and limitations-of-liability provisions in the Turbo System Warranty provide, in relevant part:

_____

[31]Plaintiffs contend that this evidence does not create a "genuine dispute as to contract breach in light of the fact that each side's airworthiness expert has opined that Western should have taken steps to link an authorized serial number to the work performed on [plaintiffs' aircraft]" and "Western did not install a propeller on [the aircraft] that was approved for use" under the STC. Docket No. 70 at 8. However, neither of these arguments is relevant to the issue of whether Western properly relied on its employees' individual mechanic certifications to perform the turbonormalization conversion.

6. **DISCLAIMER OF WARRANTIES AND LIMITATIONS OF LIABILITY** WESTERN SKYWAYS' EXPRESS WARRANTIES AND THE REMEDIES THEREUNDER ARE EXCLUSIVE AND GIVEN IN PLACE OF (a) ALL OTHER WARRANTIES, EXPRESS, IMPLIED, OR STATUTORY, WHETHER WRITTEN OR ORAL, INCLUDING BUT NOT LIMITED TO, ANY WARRANTY OF MERCHANTABILITY, FITNESS OR PARTICULAR PURPOSE, OR IMPLIED WARRANTY ARISING FROM PERFORMANCE, COURSE OF DEALING OR USAGE OF TRADE AND (b) ALL OTHER OBLIGATIONS, LIABILITIES, RIGHTS, CLAIMS OR REMEDIES, EXPRESS OR IMPLIED, ARISING BY LAW OR OTHERWISE, INCLUDING BUT NOT LIMITED TO ANY RIGHT OR REMEDIES IN CONTRACT, TORT, STRICT LIABILITY OR ARISING FROM WESTERN SKYWAYS' NEGLIGENCE, ACTUAL OR IMPUTED.

7. WESTERN SKYWAYS OBLIGATIONS AND PURCHASER'S REMEDIES UNDER WESTERN SKYWAYS EXPRESS WARRANTIES ARE LIMITED TO WESTERN SKYWAYS' CHOICE OF REFUND, REPAIR OR REPLACEMENT ON AN EXCHANGE BASIS AND INCLUDING LIABILITY FOR INCEDENTAL, SPECIAL, CO[N]SEQUENTIAL OR ANY OTHER DAMAGES, INCLUDING WITHOUT LIMITATION, ANY LIABILITY OF CUSTOMER TO A THIRD PARTY OR FOR ECONOMIC LOSS, REPLACEMENT COST, COST OF CAPITAL, LOST REVENUE, LOST PROFITS, OR LOSS OF USE OR DAMAGE TO AN AIRCRAFT, ENGINE, COMPONENT OR OTHER PROPERTY IN NO EVENT WILL WESTERN SKYWAYS' LIABILITY EXCEED THE ORIGINAL COST OF THE ENGINE.

Docket No. 59-1 at 8, ¶¶ 6-7.[32]  Relying on these provisions, defendants argue that

---

[32]Plaintiffs dispute that the warranty provisions were included in the turbonormalization agreement on the basis that Mr. Cottle was not aware of the "fourth, fifth, and sixth pages of [Exhibit A to the Barker Affidavit, Docket No. 59-1,] as those pages are neither signed nor initialed by anyone, and do not contain any information showing them to specifically apply to any aircraft or repair offer."  Docket No. 70 at 6, ¶ 7.  As discussed supra note 23, however, this position is inconsistent with the express warranty allegations, *see* Docket No. 1 at 12, ¶ 56, and with plaintiffs' statements in opposition to defendants' summary judgment motion that plaintiffs accepted Western's turbonormalization proposal, which included the warranty documents appended to Mr. Barker's affidavit [Docket No. 59-1].  *See* Docket No. 69 at 3-4, ¶¶ 9, 11.  To the extent plaintiffs assert that the warranty documents are not legally binding merely because they were unsigned, their position is without merit.  *See* 11 Williston on Contracts

plaintiffs agreed "a warranty claim would be their exclusive remedy for any defect in the product which Western provided" and thus plaintiffs' breach of contract claims, which are not warranty claims, are precluded. Docket No. 67 at 14. Plaintiffs respond only that (1) defendants waived their warranty defense by failing to raise it in their answer, and (2) defendants cannot prove their affirmative defense "in the procedural context of an opposition to Plaintiffs' summary judgment motion." Docket No. 70 at 9.

Plaintiffs' first contention is without merit. While the Court agrees that defendants' warranty argument is properly characterized as an affirmative defense, *see Williams v. Gradall Co.*, 990 F. Supp. 442, 446 (E.D. Va. 1998) ("A warranty disclaimer defense is an affirmative defense."), both the first amended answer and the final pretrial order entered on March 15, 2019 raised the warranty disclaimer provisions as a defense to liability. *See* Docket No. 37 at 10 (asserting that plaintiff's breach of contract, negligence, and unjust enrichment claims are "barred by the doctrines of waiver and estoppel"); Docket No. 77 at 3-4 (stating that the parties' "operative agreement included express warranties, under which Plaintiffs agreed to waive remedies in exchange for the warranty and its exclusive remedy provisions," and asserting the doctrine of waiver as an affirmative defense). Even assuming defendants' warranty defense was not properly raised until the final pretrial order, plaintiffs have not shown any prejudice resulting from the late disclosure. *See Creative Consumer Concepts, Inc. v. Kreisler*, 563 F.3d 1070, 1076 (10th Cir. 2009) ("[W]hen the failure to

_____

§ 30:25 (4th ed.) (updated July 2019) (stating that "parties to a contract may incorporate contractual terms by reference to a separate . . . document, . . . . including a separate document which is unsigned").

raise an affirmative defense does not prejudice the plaintiff, it is not error for the trial court to hear evidence on the issue." (internal quotation marks omitted)).

As to plaintiffs' remaining argument about the procedural posture of defendants' warranty defense, "[a] plaintiff moving for summary judgment is not obligated to negate affirmative defenses, but an affirmative defense will negate summary judgment where each element of the affirmative defense is supported by summary judgment evidence." *McCollough v. Johnson, Rodenberg & Lauinger*, 587 F. Supp. 2d 1170, 1176 (D. Mont. Nov. 21, 2008); *see also Wagner v. Feld*, 2013 WL 12328820, at *4 (D.N.M. Dec. 23, 2013) (discussing the parties' respective burdens vis à vis an affirmative defense raised in opposition to a summary judgment motion). Based on the language of the parties' contract, plaintiffs' allegations regarding the express warranty provisions, Docket No. 1 at 12, ¶ 56, and plaintiffs' affirmative representation that Western's offer included the warranty documents containing the disclaimer provisions, *see* Docket No. 69 at 3-4, ¶¶ 9, 11, plaintiffs fail to demonstrate that, in light of the "Disclaimer of Warranties and Limitations of Liability" provisions, they are entitled to summary judgment on their breach of contract claims, which is an alternative basis on which to deny summary judgment in plaintiffs' favor.

## VI. CONCLUSION

For the foregoing reasons, it is

**ORDERED** that Plaintiffs' Fed. R. Civ. P. 56 Motion for Partial Summary Judgment [Docket No. 58] is **DENIED**. It is further

**ORDERED** that Defendants' Motion for Partial Summary Judgment Pursuant to

Fed. R. Civ. P. 56 [Docket No. 59] is **GRANTED** in part and **DENIED** in part.


DATED September 25, 2019.

                                        BY THE COURT:


                                         s/Philip A. Brimmer
                                        PHILIP A. BRIMMER
                                        Chief United States District Judge